UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
PATRICK R. COLABELLA and COLABELLA &
COMPANY,

       Plaintiffs,   **MEMORANDUM & ORDER**

  - against –     10-cv-2291 (KAM)(ALC)


AMERICAN INSTITUTE OF CERTIFIED PUBLIC
ACCOUNTANTS, NEW YORK STATE SOCIETY OF
CERTIFIED PUBLIC ACCOUNTANTS, SAMUEL M.
BRONSKY, and THOMAS W. MORRIS,

       Defendants.
- - - - - - - - - - - - - - - - - - - X
**MATSUMOTO**, UNITED STATES DISTRICT JUDGE:

     Certified public accountant Patrick R. Colabella

("Colabella") and his accounting practice, Colabella & Company,

LLP ("Colabella & Company") (collectively, "plaintiffs"),

commenced this action against defendants American Institute of

Certified Public Accountants ("AICPA"), New York State Society

of Certified Public Accountants ("NYSSCPA") and NYSSCPA officers

Samuel M. Bronsky ("Bronsky") and Thomas W. Morris ("Morris")

(collectively, "defendants"), seeking declaratory relief and

damages, alleging, *inter alia*, under federal and state law that

pursuant to 42 U.S.C. § 1983, defendants unlawfully deprived

Colabella of his right to conduct peer reviews of fellow

Certified Public Accountants ("CPAs") under the auspices of

AICPA and NYSSCPA; unlawfully subjected him to loss of business profits; and violated certain sections of the Sherman and Clayton Acts by monopolizing the market for peer review of CPAs in New York State. Defendants move to dismiss the Amended Complaint (ECF No. 12, "Am. Compl.") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").[1] For the reasons that follow, defendants' Rule 12(b)(6) motions are granted as to plaintiffs' federal claims. In addition, the court declines in its discretion to exercise supplemental jurisdiction over plaintiffs' state law claims because none of the federal claims survive this motion to dismiss. Therefore, the court also dismisses plaintiffs' state law claims, without prejudice to re-file such claims in state court.

## **BACKGROUND**

### I. **Facts**

The following facts are drawn from plaintiffs' Amended Complaint and are taken as true, except where noted, for purposes of this motion.

---

[1] The parties have submitted the following briefs in connection with defendants' motions to dismiss: ECF No. 18, Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Mem."); ECF No. 22, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Pls.' Opp'n"); and ECF No. 20, Reply Memorandum of Law In Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Reply").

### A. **The Parties**

Plaintiff Colabella is a CPA licensed to practice as a public accountant in New York State; he received his license in 1973, and has actively practiced in New York and elsewhere since that time.  (Am. Compl. ¶ 111.)  Plaintiff Colabella & Company is his accounting practice.  (*Id.* ¶¶ 6, 200.)  Colabella has never been suspended or disciplined by the New York State Education Department or the State Board of Accounting, the entities that govern admission to and regulation of the practice of accounting.  (*Id.* ¶¶ 107, 111.)  In addition, at all times relevant to the present action, he was a member in good standing of two national professional associations for CPAs:  AICPA and NYSSCPA.  (*Id.* ¶¶ 46, 60, 100.)

Defendant AICPA is a national professional organization that solicits membership among CPAs in each of the United States, the District of Columbia and elsewhere.  (*Id.* ¶¶ 1, 100.)  Defendant NYSSCPA, a professional organization for CPAs in the State of New York, acts on behalf of AICPA to administer certain functions.  (*Id.* ¶¶ 63, 102.)  Defendants Bronsky and Morris were, at all relevant times, officers of NYSSCPA. (*Id.* ¶¶ 3-4.)

## B. Role of the AICPA In Certified Public Accountancy[2]

Although public accountants perform a broad range of accounting, auditing, tax and consulting activities for their clients, some functions--such as filing a report with the United States Securities and Exchange Commission ("SEC"), for instance --must be performed by a CPA.  (Am. Compl. ¶¶ 11.A, G.) Authority to license CPAs resides within each state's Board of Accountancy.  (*Id.* ¶ 11.H.)  Passage of the Uniform CPA Examination, which is prepared and graded by AICPA, is required by the Boards of Accounting in all fifty states as a prerequisite to CPA licensure.  (*Id.* ¶¶ 11.H–J., 110.) Membership in professional organizations such as AICPA and NYSSCPA is not required for one to remain in good standing as a licensed CPA, however.  (*Id.* ¶¶ 101, 103.)

Standards issued by AICPA are often incorporated into frameworks and guidelines used for conducting audits of private, public and government entities.  (*Id.* ¶¶ 12, 30, 32.)  The Generally Accepted Auditing Standards ("GAAS"), which govern private-sector financial statement audits, are established largely by AICPA.  (*Id.* ¶¶ 12.C-E.)  In addition, AICPA

---

[2] Because adjudication of defendants' motion to dismiss requires context regarding the accounting profession, peer review of CPAs and the role of the AICPA, sections B and C herein provide relevant background facts pleaded in the Amended Complaint, while sections D and E set forth the alleged facts immediately underlying plaintiffs' claims.

contributes to Generally Accepted Accounting Principles ("GAAP"), which are conventions, rules and procedures that define accepted financial accounting practices for public companies. (*Id.* ¶¶ 12.F-H, 13-16.)  Moreover, various standards and criteria first established by AICPA are incorporated into the Generally Accepted Government Auditing Standards ("GAGAS"), which are used for audits of government entities and entities that receive government awards. (*Id.* ¶¶ 24-36.)

### C. Peer Review of Certified Public Accountants

Through the peer-review process, CPAs independently assess each others' work to evaluate and maintain the quality of work within the profession. (Am. Compl. ¶¶ 48, 50.)  Peer review is mandated by law for CPAs in forty-two states; notably, however, peer review is not yet compulsory for CPAs in New York State.[3] (*Id.* ¶¶ 52.F., 112.)

Even where the law does not necessarily mandate peer review, a CPA's clientele, or the nature of his or her work, may require it.  Any CPA firm required to register with the Public Company Accounting Oversight Board ("PCAOB") must submit to

---

[3] The State of New York recently enacted New York Education Law § 7410, which makes peer review mandatory for CPAs, but the law does not go into effect until January 1, 2012. (Am. Compl. ¶ 112.)

periodic peer review by the PCAOB.[4] (*Id.* ¶¶ 52.G., 114–18.)  In addition, regulations promulgated by various government agencies make peer review obligatory for CPAs who engage in specific types of work, including audits of: government entities; entities that receive government awards; FDIC-insured and Federally Insured Thrift institutions; publicly traded companies; and borrowers of the Rural Utility Service.  (*Id.* ¶¶ 52.A–E.)

Separately, any CPA who seeks admission to or retention of membership in AICPA must be enrolled in a "practice-monitoring," or peer-review, program.  (*Id.* ¶ 53.) AICPA maintains its own "Peer-Review Program" (the "PRP"), although AICPA itself does not perform peer reviews; rather, the peer reviews are conducted by entities approved by AICPA to perform such evaluations.  (*Id.* ¶¶ 55, 57.)  Firms and individuals who choose to enroll in the PRP must undergo triennial peer reviews conducted by independent evaluators known as "peer reviewer[s]," who are authorized by the AICPA to perform the peer reviews.  (*Id.* ¶ 57.)

AICPA has promulgated standards for the administration, planning, performance, reporting and acceptance

---

[4] The Sarbanes-Oxley Act of 2002 created the PCAOB, which is charged with the oversight, regulation, inspection, and discipline of American and foreign accounting firms that audit public companies.  (*Id.* ¶ 21.)

6

of peer reviews conducted by its peer reviewers for CPA firms and individuals enrolled in the PRP. (*Id.* ¶¶ 55, 67-95.) Under these standards, an entity that administers the PRP on behalf of AICPA may appoint a "peer review committee to oversee the administration, acceptance and completion of peer reviews." (*Id.* ¶ 77.) NYSSCPA, which administers the PRP on behalf of AICPA in the State of New York, is bound by all of the PRP standards promulgated by AICPA, and oversees peer reviews conducted as part of the PRP in New York, the firm or CPA being reviewed, and the peer reviewer. (*Id.* ¶¶ 64, 76.)

AICPA's Peer Review Board supervises NYSSCPA to ensure compliance with, and consistency in the implementation of, AICPA's standards for peer review. (*Id.* ¶ 64.) Those standards make clear that reviewed firms, peer reviewers and the administering entity (NYSSCPA, in New York) are expected to cooperate in the oversight process, and AICPA has issued procedures to be followed if a reviewer "fails to cooperate in a timely, professional manner." (*Id.* ¶¶ 64, 94.) In the event that NYSSCPA and either the peer reviewer or the reviewed firm cannot resolve a disagreement through good-faith efforts, NYSSCPA may request referral of the matter to AICPA's Peer Review Board. (*Id.* ¶¶ 69, 78.)

7

**D. Section 1983 and Tort Claims**

The facts, assumed to be true for purposes of this motion, are alleged in the Amended Complaint as follows.  In May 1988, Colabella qualified to become a peer reviewer for the PRP, based on criteria established by AICPA.  (Am. Compl. ¶ 199.) Since then, Colabella (acting through Colabella & Company) has conducted peer reviews of CPA firms under the auspices of AICPA and NYSSCPA, and plaintiffs have derived material income from those peer-review engagements.  (*Id.* ¶¶ 200, 202.)

This action arose out of Colabella's participation in the PRP as a peer reviewer of four companies and individuals who were members in good standing of NYSSCPA and AICPA.  The first peer-review engagement at issue began on October 25, 2007, when Colabella commenced a peer review of FL&Z,[5] a public accounting company ("FL&Z Engagement").  (*Id.* ¶¶ 128-29.)  He conducted the FL&Z Engagement in a timely, competent, and professional manner, and consulted with an NYSSCPA technical reviewer for assistance prior to submitting his proposed findings to NYSSCPA on April 23, 2008.  (*Id.* ¶¶ 130-132.)

The second peer-review engagement at issue began on December 16, 2007, when Colabella commenced a peer review of DK&W, a public accounting company ("DK&W Engagement").  (*Id.*

---

[5] As noted in the Amended Complaint, the reviewed firms have been assigned fictitious names.  (*Id.* ¶¶ 128, 133, 138, 142.)

¶¶ 142–43.)  He conducted the DK&W Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on February 26, 2008.  (*Id.* ¶¶ 144–45.)

The third peer-review engagement at issue began on January 17, 2008, when Colabella commenced a peer review of RMB, a public accountant ("RMB Engagement").  (*Id.* ¶¶ 138–39.) Colabella conducted the RMB Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on June 30, 2008.  (*Id.* ¶¶ 140–41.)

The last peer-review engagement at issue began on April 30, 2008, when Colabella commenced a peer review of IK, a public accountant ("IK Engagement").  (*Id.* ¶¶ 133–34.) Colabella conducted the IK Engagement in a timely, competent, and professional manner, and submitted his proposed findings to NYSSCPA on June 30, 2008.  (*Id.* ¶¶ 135–36.)

Upon review of Colabella's proposed findings in each of the above-mentioned Engagements, defendants Bronsky and Morris, both members of NYSSCPA's Peer Review Committee (Bronsky was Chairman of the Peer Review Committee), issued a series of notices to Colabella regarding his peer-review submissions for the FL&Z, DK&W, RMB, and IK Engagements.  (*Id.* ¶¶ 146–48, 152, 162.)  In each notice, Bronsky and Morris demanded that Colabella make certain changes to his proposed findings.  (*Id.*

¶ 151.)  Colabella did not make all of the changes demanded, however, because in plaintiff's opinion, they were stylistic rather than substantive, and unrelated to the accuracy, quality, and professionalism of his actual reports.  (*Id.* ¶¶ 147, 151.) Consequently, in Colabella's estimation, the changes demanded were not "necessary" under the guidelines issued by AICPA and NYSSCPA, and did not warrant issuance of notices from Bronsky and Morris because Colabella was actually in compliance with all relevant guidelines.  (*Id.* ¶ 151.)  Bronsky and Morris persisted in issuing notices to plaintiff, however, because he did not make all of the changes they demanded.  (*Id.* ¶ 147.)  Colabella alleges that their notices overstated any actual unresolved issues between Colabella and his NYSSCPA technical reviewers; created the appearance of his non-compliance with AICPA's peer review standards and guidelines; and mischaracterized him as uncooperative, when in fact he was merely expressing an "independent, professional dispute" with the basis for and manner in which the Peer Review Committee reviewed his work product.  (*Id.* ¶¶ 147-149.)  The issuance of repeated notices from Bronsky and Morris resulted in Colabella's immediate suspension from the practice of conducting peer reviews on behalf of AICPA and NYSSCPA without the benefit of a prior

hearing to determine the propriety of the issuance of such notices.[6]  (*Id.* ¶¶ 156, 172, 195.)

     In addition, on June 25, 2008, Bronsky ordered Colabella to produce proof of his compliance with the continuing professional education ("CPE") requirements mandated by AICPA and NYSSCPA.  (*Id.* ¶ 162.)  Colabella furnished proof of his total CPE credits on July 10, 2008, demonstrating that he had earned sufficient credits in specific subcategories in satisfaction of the CPE requirements of New York State, AICPA

---

[6] Plaintiffs allege that Colabella was suspended from engaging in "any further [p]eer [r]eviews" in the State of New York and elsewhere due to the issuance of notices from Bronsky and Morris.  (Am. Compl. ¶¶ 156, 172.)  Those allegations do not make sense in light of other facts pleaded in the Amended Complaint, namely, that firms registered with the PCAOB must undergo peer reviews routinely (*id.* ¶ 52.G), and that all CPAs for whom peer review is mandatory and who "are *not registered and supervised by the PCAOB*" must be peer-reviewed by AICPA through NYSSCPA (*id.* ¶¶ 114–18, 195) (emphasis added).  The well-pleaded allegations indicate that peer reviews in New York State are conducted by at least two organizations:  PCAOB and NYSSCPA.  Plaintiffs have not pled any relationship between PCAOB and AICPA or NYSSCPA, such that suspension under NYSSCPA's PRP would foreclose Colabella's ability to perform peer reviews for another organization such as PCAOB.  "Allegations are not well pleaded if they are 'made indefinite or erroneous by other allegations in the same complaint.'"  *Am. Centennial Ins. Co. v. Seguros La Republica, S.A.*, No. 91-CV-1235, 1996 WL 304436, at *16 (S.D.N.Y. June 5, 1996) (quoting *Trans World Airlines, Inc. v. Hughes*, 308 F. Supp. 679, 683 (S.D.N.Y. 1969)).  Therefore, "draw[ing] all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), while disregarding allegations that are not well-pleaded, the court accepts as fact that Colabella was suspended only from engaging in any further peer reviews on behalf of AICPA and NYSSCPA as a result of the notices issued by Bronsky and Morris.

and NYSSCPA.  (*Id.* ¶¶ 157–163; ECF No. 12, Ex. A, Summary of
Continuing Professional Education Credits, dated August 5, 2005–
November 15, 2009 ("CPE Credit Summary").)[7]  Nevertheless,
Bronsky rejected Colabella's proof and refused to credit him
with sufficient compliance with GAGAS requirements, knowing that
a finding of Colabella's non-compliance with CPE requirements
would disqualify him from conducting further peer reviews until
sufficient proof of compliance was submitted and accepted by
NYSSCPA's Peer Review Committee.  (Am. Compl. ¶¶ 164–65.)

---

[7] Contrary to Colabella's assertion that the CPE Credit Summary
reflects that he earned "in excess of 273 hours of total
continuing education, in excess of 127 hours of which were in
satisfaction of the 80 hour requirement . . . and 100 hours of
which were in satisfaction of the 24 hour government auditing
requirement," the CPE Credit Summary instead shows that *as of
July 10, 2008* (the date on which Colabella furnished the CPE
Credit Summary to Bronsky), plaintiff had earned 208.5 hours of
total continuing education; 82.5 hours in satisfaction of the
"80-hour requirement"; and 80 hours in satisfaction of the "24-
hour government auditing requirement."  (CPE Credit Summary.)
The CPE Credit Summary accounts for continuing education credits
accrued between August 5, 2005, and November 15, 2009, but the
court will consider only data on the CPE Credit Summary that
reflects hours accrued as of July 10, 2008, because the court
"need not feel constrained to accept as truth conflicting
pleadings . . . that are contradicted either by statements in
the complaint itself or by documents upon which its pleadings
rely . . . ."  *In re Livent, Inc. Noteholders Secs. Litig.,* 151
F. Supp. 2d 371, 405–406 (S.D.N.Y. 2001); *see also Palm Beach
Strategic Income, LP v. Salzman*, No. 10-CV-261, 2011 WL 1655575,
at *8 (E.D.N.Y. May 2, 2011) (if documents deemed to be part of
the complaint contradict the complaint's allegations, "the
documents control" and the court need not accept the complaint's
misstatements as true) (quoting *Rapoport v. Asia Elecs. Holding
Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)).

In a January 8, 2009 letter addressed to Susan Coffey, Colabella complained to AICPA about NYSSCPA's Peer Review Committee, alleging that the NYSSCPA improperly noticed and suspended him on the basis of "repetitive, arbitrary and unfounded criticisms" of his work that were inconsistent with sound administration of the PRP. (*Id.* ¶¶ 174–75.)  On July 8, 2009, PRP Director Gary Freundlich advised Colabella that an ad hoc committee of AICPA's Peer Review Board (the "Ad Hoc Committee") would hold a hearing to consider all outstanding issues, and its decision on the issues would be final. (*Id.* ¶¶ 175–76.)  A body of materials to be used in the Ad Hoc Committee hearing--including peer-review documents, emails, and written correspondence--was served on Colabella and NYSSCPA in advance of the hearing. (*Id.* ¶¶ 177–78.)  When the Ad Hoc Committee convened to consider the identified issues on August 31, 2009, it did not call for any testimony from Colabella or accept any argument from his counsel. (*Id.* ¶ 178.)  Two days later, chairperson Susan Lieberum advised Colabella of the following findings and recommendations of the Ad Hoc Committee, *inter alia*: (1) that with respect to the DK&W Engagement, Colabella did not meet government-specific CPE requirements, and consequently, he was unqualified to perform the Engagement; (2) that with respect to the FL&Z and RMB Engagements (a) NYSSCPA's

13

comments with respect to Colabella's work were valid, and he should have revised documents as requested on a timely basis, (b) Colabella should be given feedback for not doing so, and (c) "[i]n fairness to the reviewed firm," NYSSCPA should accept the peer-review documents submitted by Colabella and send each reviewed entity an acceptance letter notwithstanding NYSSCPA's valid comments regarding Colabella's work;[8] and (3) that with respect to the IK Engagement, (a) three of the outstanding issues presented to the Ad Hoc Committee were in fact sufficiently resolved by Colabella, (b) NYSSCPA's comments with respect to Colabella's work were valid as to one remaining item, and (c) "due to the lateness of [Colabella's] review and in fairness to the reviewed firm," NYSSCPA should accept the peer-review documents submitted by Colabella and send IK an acceptance letter notwithstanding the NYSSCPA's valid comments regarding his work. (*Id.* ¶¶ 179–182, 184; Lieberum Letter at 1–2.)  The Ad Hoc Committee did not make any findings regarding

---

[8] Colabella alleges that by recommending that his peer-review reports be accepted, the Ad Hoc Committee implicitly acknowledged that his work product conformed to AICPA standards. (Am. Compl. ¶ 183.)  A September 2, 2008 letter from Susan Lieberum, writing on behalf of the AICPA PRP, makes clear, however, that AICPA directed NYSSCPA to accept Colabella's report--*notwithstanding* the errors therein--for the sake of the reviewed firm, and that he should be given feedback regarding the outstanding errors.  (ECF No. 19, Affidavit of Virgil W. Webb ("Webb Aff."), Ex. 2, September 2, 2009 letter from Susan Lieberum ("Lieberum Letter").)

14

the grievances Colabella communicated to AICPA through his January 8, 2009 letter to Coffey.  (Am. Compl. ¶¶ 174, 187.)

Colabella contends that the Ad Hoc Committee's conclusions were contrary to overwhelming evidence--including his detailed and professional responses--that he had timely responded to each of NYSSCPA's requests for changes to his work product such that there were no outstanding matters to address, and that he had indeed met the mandatory CPE requirements.  (*Id.* ¶¶ 181, 185, 188.)  He also alleges that the Ad Hoc Committee's findings were designed to create an appearance of compliance with AICPA's PRP procedures, while preventing him from exercising independence in conducting peer reviews under the auspices of AICPA and NYSSCPA, and discouraging others like him who might object to the "pettiness and impracticality in the administration" of the PRP.  (*Id.* ¶¶ 190–192.)

As a result of the Peer Review Committee's issuance of notices to Colabella, delivery of final peer-review reports to his clients was unreasonably delayed, and the cost of his compliance with the technical review of his peer-review engagements was unreasonably and unnecessarily increased.  (*Id.* ¶¶ 206.B–C.)  Furthermore, following his suspension from conducting peer reviews for the PRP, Colabella was deprived of fees that he would have derived from future peer-review

15

engagements performed under the auspices of AICPA and NYSSCPA. (*Id.* ¶ 206.E.)  In addition, Colabella alleges that through the suspension, AICPA and NYSSCPA summarily deprived him, without due process, of his right to conduct future peer reviews.  (*Id.* ¶ 224.)

John A. Demetrius peer-reviewed Colabella for the period ending April 30, 2009--which encompassed the FL&Z, DK&W, RMB, and IK Engagements--and on April 29, 2010, Demetrius opined that Colabella was fully compliant with the continuing education requirements of the AICPA, New York State, and Government Auditing Standards for the relevant period.  (*Id.* ¶ 168.)  Susan M. Rowley, a Senior Technical Manager of the AICPA PRP who supervised Demetrius' peer review, likewise concluded that Colabella was in compliance with AICPA's continuing education requirements. (*Id.* ¶ 169.)

**E.  Antitrust Claims**

Plaintiffs allege that the PRP constitutes a "virtual monopoly" in the market for peer review of CPAs in states such as New York where a "statutory peer review program" through which CPAs can undergo peer review is lacking.  (Am. Compl. ¶ 195.)  Regulations promulgated by various government agencies make peer review obligatory for CPAs who engage in specific types of work, including audits of: government entities and

entities that receive government awards; FDIC-insured and
Federally Insured Thrift institutions; publicly traded
companies; and borrowers from the Rural Utility Service.
Plaintiffs allege that all CPAs in New York State who perform
such audits *must* be peer-reviewed through NYSSCPA under the
AICPA's PRP (*id.* ¶¶ 52.A–E; 195), although the court notes that
at least one other entity--the PCAOB--also conducts peer reviews
of CPAs in this state.[9]

Plaintiffs allege that AICPA selectively and
inconsistently applies its rules, thereby purging and excluding
from its pool of approved peer reviewers those who truly seek to
exercise independence and intellectual honesty, and restricting
the performance of peer review to "those who accept the
arbitrary and capricious administration of the Peer Review
Program." (*Id.* ¶ 196.)  Consequently, plaintiffs allege, AICPA

---

[9] Although plaintiffs allege that peer reviews of CPAs in the
State of New York are administrated solely by AICPA through
NYSSCPA (*see* Am. Compl. ¶ 113), the court does not accept this
allegation as true for purposes of this motion because it is
contradicted by other statements in the Amended Complaint, and
as explained *supra*, the Court "need not feel constrained to
accept as truth conflicting pleadings that make no sense . . .
or that are contradicted either by statements in the complaint
itself or by documents upon which its pleadings rely." *In re
Livent,* 151 F. Supp. 2d at 405.  The Amended Complaint also
states that CPAs in New York who are "not registered and
supervised by the PCAOB" must submit to peer review conducted by
AICPA through NYSSCPA.  (Am. Compl. 114–18.)  If CPAs in New
York could only be peer-reviewed through the PRP administered by
AICPA and NYSSCPA, the specific PCAOB-related allegations would
be superfluous.

and NYSSCPA restrain trade by restricting the class of peer reviewers for its PRP to those who are "favored" by personnel charged with administration of the PRP, and reducing competition among CPAs who want to be peer reviewers for AICPA and NYSSCPA. (*Id.* ¶¶ 196.D-E; 197.)  Plaintiffs further allege that AICPA and NYSSCPA restrain trade among businesses required to engage CPAs by limiting the class of peer-reviewed CPAs available to conduct certain statutorily required audit services (*e.g.* auditing FDIC-insured institutions) to those who accept and abide by AICPA and NYSSCPA's inconsistent application of their own standards under the PRP.  (*Id.* ¶ 198.A.)

## II.  **Procedural History**

Plaintiffs initially brought this action against defendants on May 19, 2010.  (*See* ECF No. 1, Complaint.)  After defendants notified the court of their intention to file a motion to dismiss under Rule 12(b)(6) for failure to state a claim (*see* ECF No. 7, Letter from AICPA Requesting Pre-Motion Conference), plaintiffs filed an Amended Complaint on October 20, 2010, asserting claims identical to those in the Complaint.  Shortly thereafter, defendants filed the instant motion to dismiss all claims pursuant to Rule 12(b)(6).  (*See* ECF No. 17, Defendants' Motion to Dismiss.)  Defendants have not yet filed an answer and discovery has not yet commenced.

18

**DISCUSSION**

**I. Standard of Review**

**A. Reviewing the Motion to Dismiss**

A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) if a plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Therefore, in order to survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted)). Assessing the plausibility of claims set forth in a complaint is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ruston v. Town Bd.*, 610 F.3d 55, 58-59 (2d Cir. 2010) (quoting *Iqbal*, 129 S.Ct. at 1950). In conducting such an assessment, a court must draw all inferences in favor of the non-movant. *Vietnam Ass'n*, 517 F.3d at 115 (quoting *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007)). However, allegations must consist of more than mere labels, legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Arar v. Ashcroft*, 585 F.3d 559, 594 (2d Cir. 2009) (quoting

19

*Iqbal*, 129 S.Ct. at 1949).  Moreover, bare legal conclusions unsupported by factual allegations are "not entitled to the assumption of truth."  *Ruston*, 610 F.3d at 59 (citing *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010)).

## B. Consideration of Documents Outside the Amended Complaint

Because both parties submitted materials outside the pleadings in their moving papers, the court must determine whether to treat the instant motion as a motion to dismiss or convert it to one for summary judgment.  *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("[w]hen matters outside the pleadings are presented in response to a Rule 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.") (internal quotations omitted).  The district court has "complete discretion" to determine whether to convert the motion to dismiss into one for summary judgment.  *Hoy v. Inc. Village of Bayville*, 765 F. Supp. 2d 158, 164 (E.D.N.Y. 2011) (citing *Carione v. United States,* 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005)).  Furthermore, summary judgment is generally inappropriate before the parties have had the opportunity to engage in discovery.  *Kalin v. Xanboo, Inc.*,

526 F. Supp. 2d 392, 399 (S.D.N.Y. 2007); *compare United States v. City of New York*, 683 F. Supp. 2d 225, 245 (E.D.N.Y. 2005) (conversion to summary judgment deemed appropriate where there was a "highly developed record before the court" that contained years' worth of discovery materials because interrogatories and document requests had been exchanged, litigated, and answered; named defendants had been deposed; and experts on both sides had submitted reports and been deposed, such that neither side should be surprised by the court's decision to convert the motion), *with Kalin*, 526 F. Supp. 2d at 399 (declining to convert motion to dismiss where the issue raised--sufficiency of the pleadings--did not require discovery, and discovery was stayed pending motion to dismiss). The present case is still in its nascent stages; defendants have not yet filed an answer, and the parties have not engaged in discovery, which would significantly aid the court in rendering a decision on a summary judgment motion. The court therefore finds that conversion of defendants' motion to dismiss is inappropriate and will decide defendants' motion pursuant to Rule 12(b)(6).

    In deciding defendants' motion to dismiss, the court may properly consider facts alleged in the complaint, any exhibits attached to the complaint, and documents incorporated by reference in the complaint. *DiFolco v. MSNBC Cable*

*L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  Notably, "limited quotation" from a document does not render the document "incorporate[ed] by reference" into the complaint for purposes of a Rule 12(b)(6) motion.  *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985).  Even if a document is not incorporated by reference, however, the court may still consider it if the complaint "relies heavily upon its terms and effect," rendering the document "integral" to the complaint.  *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53).  Contracts that underlie the claims brought in a suit are classic examples of documents that may be considered on a motion to dismiss even though the plaintiff does not physically attach them to the Amended Complaint.  *Ackerman v. Local Union 363, Int'l Bhd. of Elec. Workers*, 423 F. Supp. 2d 125, 127 (S.D.N.Y. 2006).

In their moving brief, defendants attempt to introduce seven exhibits and an affidavit sworn to by the assistant general counsel of AICPA.  (Defs.' Mem. at 1; Webb Aff. and attached Exhibits 1-7.)  Likewise, in their opposition memorandum, plaintiffs attempt to introduce three exhibits and an affidavit sworn to by Colabella.  (Pls.' Opp'n at 2; ECF No. 21-2, Affidavit of Patrick R. Colabella in Opposition

("Colabella Aff.") and attached Exhibits A-C.)  Applying the
standards set forth *supra*, the court will disregard all
documents attached to the parties' motion papers except: (1) the
Amended Complaint, attached as Exhibit 1 to the Webb Affidavit;
and (2) the Lieberum Letter.  The Lieberum Letter may be
considered in deciding the present motion because plaintiffs
referred to the letter and "relie[d] heavily on its terms and
effect," *Mangiafico*, 471 F.3d at 398, in drafting their Amended
Complaint.  (*See* Am. Compl. ¶¶ 179-192) (discussing various
aspects of the Lieberum Letter to support claim of defendants'
unfair treatment of plaintiffs).  Because the remaining
documents submitted by the parties were not attached to the
Amended Complaint, incorporated by reference, or so heavily
relied upon as to render them integral to the Amended Complaint,
the court excludes them from consideration for purposes of
deciding the Rule 12(b)(6) motion to dismiss for failure to
state a claim.

## II.  Sufficiency of the Pleadings as to Section 1983 Claim

### A. Pleading Standard

In relevant part, 42 U.S.C. § 1983 ("Section 1983")
provides that:

> Every person who, under color of any
> statute, ordinance, regulation, custom, or
> usage, of any State . . .  subjects, or
> causes to be subjected, any citizen of the

23

> United States or other person within the
> jurisdiction thereof to the deprivation of
> any rights, privileges, or immunities
> secured by the Constitution and laws,
> shall be liable to the party injured in an
> action at law, suit in equity, or other
> proper proceeding for redress . . . .

Section 1983 itself does not create any substantive rights; rather, it provides a procedural mechanism for redressing the deprivation of rights created by the Constitution or laws of the United States. *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). To state a cognizable claim under Section 1983, plaintiffs must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Weiss v. Inc. Village of Sag Harbor*, 762 F. Supp. 2d 560, 568 (E.D.N.Y. 2011) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)).

The Supreme Court, in *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982), established a two-prong test for determining when a private party's actions can be deemed to satisfy Section 1983's requirement that the challenged conduct was "under color of state law." Actions of a private party can be deemed "fairly attributable" to the state, and therefore

24

treated as action taken "under color of state law," when (1) the deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and (2) "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010) (quoting *Lugar*, 457 U.S. at 937). A private party's actions may be attributable to the state under the second *Lugar* prong if it meets one of three tests: (1) "The 'compulsion test': the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state"; (2) "The 'public function test': the entity 'has been delegated a public function by the [s]tate,'"; or (3) "The 'joint action test' or 'close nexus test': the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." *Hollander*, 624 F.3d at 34 (quoting *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)(internal citations omitted)).

In addition, to state a cognizable Section 1983 claim, plaintiff must identify a constitutionally protected liberty or property interest of which he was deprived without due process.

*See Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) ("whether the plaintiff has a property or liberty interest protected by the Constitution" is a threshold issue in analysis of Section 1983 claims).

### B. Application

#### 1. State Actor Requirement

To adequately plead a Section 1983 claim, plaintiffs must allege that defendants acted under color of state law when they suspended Colabella from the practice of conducting peer reviews for CPAs under the auspices of AICPA and NYSSCPA.  As plaintiffs' allegations fail to meet either *Lugar* prong, they fail to plead the requisite state actor requirement.

##### a. First *Lugar* Prong

Applying the first *Lugar* prong, plaintiffs fail to plead that the deprivation Colabella suffered--namely, his "right to conduct future peer reviews" (*see* Am. Compl. ¶ 224)-- resulted from the "exercise of a right or privilege having its source in state authority . . . ."  *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 432-33 (2d Cir. 1995) (quoting *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620 (1991)).  In other words, plaintiffs must allege that AICPA and NYSSCPA acted with state-given authority when they revoked Colabella's approval to conduct peer reviews under their auspices.

26

Plaintiffs purport to satisfy this prong by alleging that the State of New York relies on AICPA and NYSSCPA as the sole administrators of CPA peer reviews and as the state's "surrogate[s]" to "implement[] [its] policy . . . [regarding] the Peer Review process for Certified Public Accountants within the State." (Am. Compl. ¶¶ 113, 123.)

Besides the fact that AICPA and NYSSCPA are not the "sole administrators" of CPA peer reviews in New York State,[10] plaintiffs' allegation of the state's reliance on AICPA and NYSSCPA conflicts with their simultaneous assertion that the state recently demonstrated its *bona fide* interest in regulating the peer review of public accountants by promulgating a statute providing for mandatory peer review of CPAs, beginning on January 1, 2012. (*Id.* ¶ 112.)  The recency of the state's promulgation of this new law--one that has not yet even taken effect--to mandate and regulate, *for the first time*, the peer review of CPAs in New York, strongly implies that the state did not have a policy regarding the peer review of CPAs before.

Therefore, plaintiffs' allegations that AICPA and NYSSCPA were acting as "surrogates" of the state to "implement" a state policy that was heretofore nonexistent are conclusory and not well-pleaded, and therefore not accepted as true for

---

[10] As alleged in the Amended Complaint, PCAOB also conducts peer reviews, as discussed *supra*.  (*See* Am. Compl. ¶¶ 114-18.)

purposes of deciding this motion.  While a court deciding a
motion to dismiss must interpret the Amended Complaint liberally
and draw all reasonable inferences in the non-movant's favor,
*Chambers*, 282 F.3d at 152, the court "need not feel constrained
to accept as truth conflicting pleadings that make no sense . .
. or that are contradicted either by statements in the complaint
itself or by documents upon which its pleadings rely . . . ."
*In re Livent,* 151 F. Supp. 2d at 405; *MMC Energy, Inc. v.
Miller*, No. 08-CV-4353, 2009 WL 2981914, at *7 (S.D.N.Y. Sept.
14, 2009) (dismissing claim where necessary supporting
allegation was specifically contradicted by other portions of
the complaint).

Plaintiffs also argue that they "satisfy the first
prong [of *Lugar*] by . . . showing that Colabella was sanctioned
on four separate occasions, by being precluded from the conduct
of peer reviews, because of the actions taken by Defendants,
AICPA and NYSSCPA, as an exercise of their disciplinary
authority--this despite Colabella's certification and good
standing as a CPA in New York State . . . ."  (Pls.' Opp'n at
13.)  This argument does not support plaintiffs' position,
however, because the mere fact of Colabella's sanction does not
satisfy the first *Lugar* prong as it fails to demonstrate, or
even assert, that New York State created AICPA and NYSSCPA's

right to sanction Colabella, or that such sanctioning was a
"rule of conduct imposed by the State or by a person for whom
the State is responsible." *Hollander*, 624 F.3d at 33 (quoting
*Lugar*, 457 U.S. at 937). Therefore, the court finds that
plaintiffs' Amended Complaint fails to satisfy the first *Lugar*
prong.

### b. Second *Lugar* Prong

Even assuming that plaintiffs satisfied the first
*Lugar* prong by adequately pleading that AICPA and NYSSCPA were
acting with authority from New York State in administering the
PRP, however, plaintiffs fail to allege facts that meet the
second *Lugar* prong, as no well-pleaded facts in the Amended
Complaint properly allege that defendants met the "compulsion,"
"public function," or "joint action/close nexus" tests outlined
in *Sybalski*, 546 F.3d at 257.

### i. Compulsion Test

Under the "compulsion test," a nominally private
entity may be considered a state actor when the party acted
pursuant to the coercive power of the state or was controlled by
the state. *Sybalski*, 546 F.3d at 257 (quoting *Brentwood Acad.
v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296
(2001)). The "coercion" inquiry focuses on whether the
challenged activity was "compelled or even influenced" by state

29

regulation.  *Husain v. Springer*, 193 F. Supp. 2d 664,
672 (E.D.N.Y. 2002) (quoting *Rendell-Baker v. Kohn*, 457 U.S.
830, 841 (1982)).  For example, in *Brentwood*, the Supreme Court
noted that Amtrak, though nominally private, was considered a
"state actor" for the purpose of determining if individual
rights guaranteed by the Constitution were violated because
Amtrak was created pursuant to a federal law to achieve
governmental objectives, and the government retains authority to
appoint the majority of Amtrak's directors; therefore, Amtrak
could fairly be said to act under the compulsion of the state.
*Brentwood*, 531 U.S. at 296 (citing *Lebron v. Nat'l R.R.
Passengers Corp.*, 513 U.S. 374, 400 (1995)).  In contrast, in
*Rendell-Baker*, the Supreme Court found that terminations of
employment effected by a private school that (1) received ninety
to ninety-nine percent of its funding from the state; (2) was
subject to state regulation; and (3) contracted with the state
to perform certain services for students, did not constitute
"state action."  457 U.S. at 832–33.  The Second Circuit
explained in *Horvath v. Westport Library Ass'n* that the
"decisive factor" in the Supreme Court's *Rendell-Baker* decision
was that "the school's personnel decisions were uninfluenced by
public officials and that 'the decisions to discharge the
petitioners were not compelled or even influenced by any state

30

regulation.'"  362 F.3d 147, 152 (2d Cir. 2004) (quoting *Rendell-Baker*, 457 U.S. at 841).

In the instant case, plaintiffs failed to allege facts that, if established, would show that defendants' suspension of Colabella was action compelled by the State of New York. Plaintiffs do not allege that AICPA, NYSSCPA, or their leaders act under the coercion or influence of the state, or that the state influenced or compelled defendants to suspend Colabella as a peer reviewer for AICPA and NYSSCPA.  Nor do plaintiffs allege that the state has any role in choosing or directing the leadership of AICPA and NYSSCPA.  At most, plaintiffs contend that defendants acted as "surrogates" of the state (an assertion that would imply coercion), but the court does not accept that allegation for the reasons set forth *supra*.

### ii. **Public Function Test**

The "public function" test centers upon an inquiry of whether the challenged activity is one that is "traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974) (quoted in *Rendell-Baker*, 457 U.S. at 842).  "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).  Activities that have met the "public function"

31

test include those that are "traditionally associated with sovereignty, such as eminent domain . . . ." *Jackson*, 419 U.S. at 352; *see also Terry v. Adams*, 345 U.S. 461 (1953) (election); *Marsh v. Alabama*, 326 U.S. 501 (1946) (company town); *Evans v. Newton*, 382 U.S. 296 (1966) (municipal park); *West v. Atkins*, 487 U.S. 42, 54-57 (1988) (imprisonment of individuals as punishment for criminal activity); *Flagg Bros.*, 436 U.S. at 163 (citing education, fire and police protection, and tax collection as examples of exclusive "municipal functions").

Plaintiffs have not alleged that defendants' administration of peer reviews conducted under the auspices of AICPA and NYSSCPA is an activity that is "traditionally exclusively reserved to the State." Plaintiffs do assert that New York State's Board of Accountancy uses the Uniform CPA Examination in determining which public accountancy candidates should be licensed as CPAs, and that AICPA prepares and grades the examination. (*See* Am. Compl. ¶¶ 11.H-J., 110.) Even if AICPA and NYSSCPA were serving a "public function" by developing and grading the Uniform CPA Examination for use by the state's Board of Accountancy, that alone would be insufficient to confer "state actor" status for purposes of this analysis because preparation of the Uniform CPA Examination is not the activity complained of in the present action and plaintiff's status as a

32

CPA has not been affected by defendants' challenged activities. For a private entity to be considered a state actor, "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." *Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968). In other words, "the state action, not the private action, must be the subject of complaint." *Id*. Here, the subject of plaintiffs' Amended Complaint does not meet the "public function" test because defendants' administration of a peer-review program for CPAs-- unlike elections, tax collection, and education--is not a function "traditionally exclusively reserved to the State."

### iii. **Joint Action/Close Nexus Test**

The "joint action/close nexus" test is met when the relationship between a private entity and the government is so "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings" that actions of the private entity must be viewed as actions of the state. *Brentwood*, 531 U.S. at 298. Put another way, "[a] nexus of 'state action' exists between a private entity and the state when the state . . . is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert . . . or is

33

entwined with governmental policies." *Flagg v. Yonkers Savs. and Loan Ass'n, FA*, 396 F.3d 178, 187 (2d Cir. 2005) (quoting *Cranley v. Nat'l Life Ins. Co.*, 318 F.3d 105, 111 (2d Cir. 2003)).

Determination of whether specific conduct constitutes state action is a "'necessarily fact-bound inquiry.'" *Cranley*, 318 F.3d at 111–12 (quoting *Brentwood*, 531 U.S. at 298). Plaintiffs claim that a number of facts alleged in the Amended Complaint demonstrate the requisite entwinement between defendants and New York State, but the court is not persuaded that the proffered allegations satisfy the "joint action/close nexus" test. Plaintiffs claim, for instance, that AICPA's role in preparing and grading the Uniform CPA Examination, which is used by the State Board of Accounting (*see* Am. Compl. ¶¶ 11.H–J., 110), renders AICPA and NYSSCPA "entangle[d]" with the state. (Pls.' Opp'n at 15–16.) The state's use of professional assessments privately executed by a private entity does not automatically cloak the entity with the state's authority, however. In *Rohan v. Am. Bar Ass'n*, another court within this district determined that the American Bar Association ("ABA")-- which, like AICPA and NYSSCPA, is a professional association--is not a state actor, even though admission to practice law in New York State requires graduation from an ABA-accredited law

34

school, because "the State of New York has not explicitly delegated to the ABA its responsibility for setting the requirements that an individual must meet in order to be licensed as an attorney-at-law" and "any conferral of monopoly status on the ABA by New York State does not convert the ABA into a state actor."  No. 93-CV-1338 (SJ), 1995 WL 347035, at *5 (E.D.N.Y. May 31, 1995), *aff'd on other grounds*, 100 F.3d 945 (2d Cir. 1996); *see also Anderson v. La. Dental Ass'n*, 372 F. Supp. 837, 841–42 (M.D. La. 1974), *aff'd*, 502 F.2d 783 (5th Cir. 1974) (professional association not liable as a state actor for denying plaintiff membership because practice of dentistry in the state is not contingent upon membership in association and "none of these purely private associations have any control whatsoever over the practice of dentistry in the [state]"). Similarly, plaintiff's ability to practice as a CPA is not contingent upon membership in the private defendant associations.

Plaintiffs' allegation that AICPA's promulgation of many standards used in GAAS, GAAP, and GAGAS (*see* Am. Compl. ¶¶ 12–16, 24–36) is evidence of entwinement between the state and AICPA and NYSSCPA (*see* Pls.' Opp'n at 15) also fails in light of the Supreme Court's recognition that a state's adoption of rules and standards promulgated by a private entity does not convert

35

the private entity into a "state actor."  *See Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 195 (1988) (private athletic association not a state actor even though state university adopted association's standards to govern its athletic activities).  Furthermore, the court disagrees with plaintiffs' contention that entwinement with the state is evident from the tax-exempt status of AICPA and NYSSCPA, through which both entities receive substantial assistance from the State of New York.  (Am. Compl. ¶¶ 124-26; Pls.' Opp'n at 16.)  In *Blum v. Yaretsky*, the Supreme Court concluded that a "close nexus" did not exist between a private mental facility and the government--even though the state subsidized the cost of the facility, paid the expenses of the patients, and licensed the facility--because the state had no role in the complained-of activity, the discharge and transfer of patients without a hearing.  457 U.S. 991, 1004 (1982).  Here, plaintiffs do not allege the state's involvement or role in the events leading to Colabella's suspension as a peer reviewer for AICPA and NYSSCPA.  Therefore, the mere fact that AICPA and NYSSCPA are tax-exempt, non-profit corporations is insufficient to demonstrate entwinement between defendants and the state.

Nor is the court persuaded by plaintiffs' claim that the state depends on AICPA for the peer review of CPAs who audit

specific types of entities[11] because AICPA and NYSSCPA are--with
the exception of PCAOB--the "sole source of accreditation" for
CPAs who must fulfill a mandatory peer-review requirement.
(Pls.' Opp'n at 14, 16; Am. Compl. ¶¶ 52, 114–18, 195.)  Without
more, plaintiffs' allegation fails to show a sufficiently close
nexus between NYSSCPA and the state.  The purpose of the close
nexus test is "to assure that constitutional standards are
invoked only when it can be said that the state is *responsible*
for the specific conduct of which the plaintiff complains."
*Blum*, 457 U.S. at 1004 (emphasis in original).

In *Brentwood*, the Supreme Court found that a nominally
private athletic association in Tennessee was a "state actor"
for purposes of a Section 1983 action because the association
was marked by "unmistakable" and "overwhelming" entwinement with
the state:  public school officials comprised the overwhelming
majority of membership; those members elected representatives,
all of whom were public officials at the time of the Court's
decision; and the representatives promulgated the rules for
which the association was challenged on constitutional grounds.
531 U.S. at 298–99, 302.  In addition, the Court observed that
the state had "provided for entwinement from top down,"

---

[11] Government entities and entities that receive government
awards; FDIC-insured and Federally Insured Thrift institutions;
publicly traded companies; and borrowers from the Rural Utility
Service.  (Am. Compl. ¶¶ 52.A–E.)

assigning state board members *ex officio* to serve as members of the association's board of control and legislative council, and treating the association's ministerial employees as state employees in terms of eligibility for membership in the state retirement system. *Id.* at 300.

Plaintiffs have alleged no facts that begin to approach the level of entwinement found in *Brentwood*. Rather, plaintiffs' allegations more closely resemble those in *Flagg*, in which the Second Circuit affirmed the district court's finding that a private savings and loan association did not engage in "state action" when it refused to pay interest on the plaintiffs' escrow account because the association did not have a "close nexus" with the state. 396 F.3d at 187. In so finding, the court noted that the association did not withhold interest due to a federal mandate or direction or advisement from a state agent; that the relevant government agency maintained a neutral position regarding the association's actions; and that the agency and association did not form a "joint enterprise." *Id.* In sum, the court observed, the association was a "private entity participating in a regulated field of activity," and no state action had occurred. *Id*.

Plaintiffs here have not alleged that the state encouraged or was responsible for AICPA and NYSSCPA's decision

to suspend plaintiff from conducting peer reviews on behalf of those entities.  Nor have plaintiffs alleged any facts to support a finding that the state was so entangled with AICPA and NYSSCPA such that any action taken by defendants should be considered state action.  As such, the court finds that the allegations set forth in the Amended Complaint fail to satisfy the "joint action/close nexus" test.[12]

---

[12] The court notes that plaintiffs' reliance on a five-factor test articulated by the Second Circuit in *Jackson v. Statler Found.*, 496 F.2d 623 (2d Cir. 1973), to support their claim that the Amended Complaint adequately alleges state action (*see* Pls.' Opp'n at 14) is misplaced.  In *Statler*, the Second Circuit laid out "five factors which are particularly important to a determination of 'state action': (1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms."  496 F.2d at 629.  The Supreme Court later "tightened the proof required for a showing of state action," rendering the *Jackson* analysis inapposite.  *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1191 (S.D.N.Y. 1988); *see also Blum*, 457 U.S. at 1011 (government may subsidize private entities without assuming constitutional responsibility for their actions); *Rendell-Baker*, 457 U.S. at 842 (private entity's performance of a function that serves the public does not make its acts governmental action); *Jackson*, 419 U.S. at 350 (extensive regulation by the government does not transform the actions of the regulated entity into those of the government)).

## 2. Deprivation Requirement

Plaintiffs' Section 1983 claim cannot survive a motion to dismiss for failure to state a claim because plaintiffs failed to allege facts sufficient to support a finding of state action.  The court also finds that plaintiffs have not alleged a constitutionally protected property or liberty interest that would entitle them to due process protection.  To meet the deprivation requirement of a Section 1983 claim, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi*, 850 F.2d at 72.  Only after that threshold is met must the court consider whether the deprivation was effected without due process.  *Id.*

Colabella alleges that defendants deprived him of "his right . . . to practice his profession as a peer reviewer" and the "substantial fees" that he would have earned by conducting peer reviews during the period following the date of his suspension, until present.  (Am. Compl. ¶¶ 219, 222, 224, 226–27.)  The court notes that the Amended Complaint is unclear as to whether Colabella alleges deprivation of a property right or a liberty right, and the parties' briefs do not elucidate the matter:  defendants frame the issue as one involving a liberty interest (*see* Defs.' Mem. at 17), while plaintiffs refer only to

40

a "property right" (*see* Pls.' Opp'n at 11).  Although the court

will analyze the alleged deprivation under both standards, its

conclusion is the same:  Plaintiffs have not alleged deprivation

of a constitutionally protected interest.

### a. Deprivation of a Property Interest

"To have a property interest in a benefit, a person

clearly must have more than an abstract need or desire for it"

and "[h]e must have more than a unilateral expectation of it."

*Clarry v. U.S.*, 85 F.3d 1041, 1046 (2d Cir. 1996) (quoting *Bd.*

*of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  "'[He] must,

instead, have a legitimate claim of entitlement to it' under

state or federal law in order to state a [Section] 1983 claim."

*Seymour's Boatyard, Inc. v. Town of Huntington*, No. 08-CV-3248,

2009 WL 1514610, at *4 (June 1, 2009) (quoting *Finley v.*

*Giacobbe*, 79 F.3d 1285, 1296 (2d Cir. 1996)).  The Constitution

does not create such entitlements; rather, entitlements are

created and defined by "existing rules or understandings that

stem from an independent source such as state law."  *Harrington*

*v. County of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010) (quoting

*Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).

"When determining whether a plaintiff has a claim of

entitlement, [the court] focus[es] on the applicable statute,

contract or regulation that purports to establish the benefit."

41

*Martz v. Inc. Village of Valley Stream*, 22 F.3d 26, 30 (2d Cir.
1994) (citing *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 175
(2d Cir. 1991), *cert. denied*, 502 U.S. 907 (1991)).

In the Amended Complaint, Colabella claims a property
interest primarily in "his right to practice his profession as a
peer reviewer," and secondarily in the "substantial fees" he
would have earned through such peer review.  Plaintiffs do not
cite to any "statute, contract, or regulation" that purportedly
confers on Colabella the benefit at issue--the right to conduct
peer reviews on behalf of AICPA and NYSSCPA.  The court has also
searched, without success, for any such statute or regulation
that might have conferred upon Colabella a "legitimate claim of
entitlement" to the right to conduct peer reviews.  Accordingly,
the court finds that Colabella's interest in practicing his
profession as a peer reviewer for AICPA and NYSSCPA, and the
fees he would have generated through that work, are outside the
scope of constitutional protections that may underlie a Section
1983 claim.

### b. Deprivation of a Liberty Interest

It is well-settled that a person's freedom "to engage
in any of the common occupations of life" is a liberty interest
protected by the Fourteenth Amendment. *Cityspec, Inc. v.* Smith,
617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009) (quoting *Roth*, 408 U.S.

42

at 572).  Courts in the Second Circuit have consistently held, however, that "one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest." *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) (citations omitted), *aff'd*, 225 F.3d 646 (2d Cir. 2000); *Thomas v. Held*, 941 F. Supp. 444, 450 (S.D.N.Y. 1996) (one's liberty interest in pursuing the occupation of his choosing is implicated only when action is "so damaging . . . that [it] would hinder seriously the employee from finding work in that field").

Plaintiffs do not claim that as a result of defendants' actions, Colabella has lost the ability to participate in the entire field of accounting, and they have not alleged that Colabella's suspension has had any effect on his ability to earn fees by performing work in the field of certified public accounting.  Plaintiffs' well-pleaded allegations do not even state that Colabella has been hindered from pursuing work in the entire field of performing peer reviews for CPAs.  As the Amended Complaint makes clear, PCAOB also conducts peer reviews (Am. Compl. ¶¶ 52.G., 114–18), and plaintiffs have not alleged that Colabella is unable to conduct peer reviews on behalf of PCAOB.  Rather, plaintiffs allege only that Colabella is unable to perform further peer reviews on

43

behalf of AICPA and NYSSCPA.  Such pleadings fall short of demonstrating that defendants' actions implicated a cognizable liberty interest, and accordingly, the court grants defendants' motion to dismiss plaintiffs' Section 1983 claim for failure to state a claim.

**III.** **Sufficiency of the Pleadings as to Antitrust Claims**

    **A.** **Antitrust Standing**

Plaintiffs assert two antitrust claims against defendants:  a restraint-of-trade claim based on Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 ("Section 1" and "Section 2," respectively), and a price-discrimination claim based on Sections 2 and 4 of the Clayton Act, 15 U.S.C. §§ 13, 15.  The court begins its analysis of these claims by addressing defendants' claim that plaintiffs lack antitrust standing (*see* Defs.' Mem. 18).

It is well-settled that Plaintiffs who bring antitrust claims must have "antitrust standing" in addition to Article III standing.  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (citing *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006)).  To establish antitrust standing, a plaintiff must first show that he has suffered an antitrust injury, an "injury of the type the antitrust laws were intended to prevent and that flows from

44

that which makes defendants' acts unlawful." *Id.* (quoting
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489
(1977)).  In addition, a plaintiff must show that he is an
"efficient enforcer" of the antitrust laws.  *Id.* (citing *Volvo
N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55,
66 (2d Cir. 1988)).  Determination of whether one is an
"efficient enforcer" of the antitrust laws depends on the
following factors:

> (1) the directness or indirectness of the
> asserted injury; (2) the existence of an
> identifiable class of persons whose self-
> interest would normally motivate them to
> vindicate the public interest in antitrust
> enforcement; (3) the speculativeness of the
> alleged injury; and (4) the difficulty of
> identifying damages and apportioning them
> among direct and indirect victims so as to
> avoid duplicative recoveries.

*Volvo*, 857 F.2d at 66 (citing *Associated Gen. Contractors v.
California State Council of Carpenters*, 459 U.S. 519, 540-45
(1983)).

Plaintiffs allege that AICPA and NYSSCPA "acted in
combination and in conspiracy to administer the [PRP] in
restraint of trade" by administering the PRP in a manner that
contradicts its own published and advertised standards and
guidelines, and by excluding from its ranks of peer reviewers
those who, like Colabella, "place their independence and
intellectual honesty above the dictates of . . . [defendants']

45

inconsistent application and enforcement" of the PRP standards and rules.  (Am. Compl. ¶¶ 196.A–E, 198.A–B., 230.)  Plaintiffs allege that AICPA and NYSSCPA so acted with the intent of restraining competition "between and among otherwise competent peer reviewers in the State of New York, and elsewhere, so as to limit the number of peer reviewers and control the number of firms actually conducting peer reviews."  (*Id.* ¶ 243.)

Plaintiffs claim that three antitrust injuries have resulted from defendants' acts in violation of antitrust laws: (1) deprivation of fees that Colabella otherwise would have earned by conducting peer reviews but for defendants' suspension, which resulted from their "arbitrary and capricious" administration of the PRP; (2)  deprivation of Colabella's right to compete for peer review engagements, a deprivation shared by other CPAs who may likewise be arbitrarily and capriciously suspended from AICPA's program; and (3) deprivation to members of the general public who might need services of peer-reviewed CPAs of their "right and ability to secure competent, independent, peer reviewed" CPAs.  (Am. Compl. ¶¶ 232, 236–41.)

## 1. Antitrust Injury

As an initial step in alleging antitrust injury, a plaintiff must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive."  *Port*

46

*Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117,
122 (2d Cir. 2007).  To meet that requirement, the plaintiff
must show "that the challenged action has had an *actual* adverse
effect on competition as a whole in the relevant market . . . ."
*George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d
136, 139 (2d Cir. 1998) (quoting *Capital Imaging v. Mohawk
Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis
in original)).

Plaintiffs fail to allege an anticompetitive practice
that affects "competition as a whole in the relevant market,"
however.  *George Haug Co.*, 148 F.3d at 139.  The practice of
which plaintiffs complain is defendants' administration of the
PRP in a manner that removes from the pool of AICPA and NYSSCPA
peer reviewers otherwise-competent peer reviewers who insist on
exercising independence and resist bending to the arbitrary
whims of the PRP administrators.  (Am. Compl. ¶¶ 196.E, 197–98.)
Plaintiffs allege that this practice harms competition in the
overall market for peer review by "restrict[ing] the class of
peer reviews to those who are 'favored' by those charged with
the administration of the Peer Review Program . . . thereby
reducing competition for no purpose other than to monopolize and
control the administration of the Peer Review Program by those
charged with [its] administration . . . ."  (Am. Compl. ¶ 197.)

47

Apart from allegations that Colabella himself has suffered a loss by being suspended from conducting peer reviews for AICPA and NYSSCPA, the Amended Complaint is devoid of any other well-pleaded facts that support his contention that competition has been reduced.  Without more, plaintiffs fail to demonstrate any antitrust injury, because "[a]lleging injury as an individual competitor within the market does not suffice to state a claim for an antitrust injury as antitrust statutes were enacted to protect competition and not individual competitors." *Wolf Concept S.A.R.L. v. Eber Bros. Wine and Liquor Corp.*, 736 F. Supp. 2d 661, 669 (W.D.N.Y. 2010); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.")

Moreover, plaintiffs have failed to even allege injury to themselves as individual competitors in the market for peer review:  as discussed *supra*, the Amended Complaint does not allege that because Colabella cannot conduct peer reviews on behalf of AICPA and NYSSCPA, he cannot conduct peer reviews on behalf of *any* entity.  Plaintiffs have not alleged that Colabella's suspension from conducting peer review on behalf of

48

AICPA and NYSSCPA has any bearing on his ability to conduct peer reviews on behalf of PCAOB, for example.  For these reasons, the court finds that plaintiffs have not pleaded facts sufficient to show an antitrust injury.  Plaintiffs therefore lack antitrust standing to bring their claims under the Sherman and Clayton Acts, and the court need not analyze the "efficient enforcer" factors.  Even assuming that plaintiffs did have antitrust standing, however, as discussed *infra*, plaintiffs' claims under the Sherman and Clayton Acts would nevertheless fail under Rule 12(b)(6).

### 2. Pleading Standards for Sherman Act Claims

### a. Section 1 Claim

Under Section 1 of the Sherman Act, every contract, combination, or conspiracy "in restraint of trade or commerce among the several States" is illegal.  15 U.S.C. § 1.  This court recently recognized in *LaFlamme v. Societe Air France*, that "[b]ecause Section 1 of the Sherman Act does not prohibit all restraints of trade, but rather only *agreements* to restrain trade, '[t]he crucial question in a Section 1 case is therefore whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express.'"  702 F. Supp. 2d 136, 146 (E.D.N.Y. 2010) (Matsumoto, J.) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Allegations of

parallel conduct or "specific allegations of actual agreement among defendants" may be sufficient to state such an agreement, *LaFlamme*, 702 F. Supp. 2d at 146 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 564–565 n.10 (2007)), but "'a few stray statements speak[ing] directly of agreement . . . are merely legal conclusions resting on . . . prior allegations,' and cannot be accepted as true." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 333 (D.Vt. 2010) (quoting *Twombly*, 550 U.S. at 564)).

### b. Section 2 Claim

Section 2 of the Sherman Act prohibits monopolization of "any part of the trade or commerce among the several States." 15 U.S.C. § 2.  To state a monopolization claim under Section 2 of the Sherman Act, one must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

### 3. Application

### a. Section 1 Claim

An "agreement, tacit or express," is central to a Section 1 claim.  *Starr*, 592 F.3d at 321 (quoting *Theatre Enters. Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).  Although plaintiffs assert that AICPA and NYSSCPA "acted in combination and in conspiracy to administer the Peer Review Program in restraint of trade" (Am. Compl. ¶ 230), they fail to state any specific facts to elevate the bald assertion to a "plausible claim for relief."  *See Iqbal*, 129 S.Ct. at 1950.

Plaintiffs contend, for example, that NYSSCPA's Peer Review Committee unjustifiably issued notices to Colabella based on erroneous claims that his work in specific engagements did not conform to the PRP's standards, and that the issuance of multiple notices led to his suspension from the PRP.  (Am. Compl. ¶¶ 147–56.)  Plaintiffs further allege that when Colabella appealed to AICPA about his alleged mistreatment leading to NYSSCPA's suspension, AICPA's Ad Hoc Committee rubber-stamped NYSSCPA's decision to "create the appearance of propriety" of NYSSCPA's actions.  (Am. Compl. ¶¶ 174–90.)  Such facts, without more, do not give rise to a plausible inference of conspiracy.  In *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, the district court dismissed plaintiff's Section 1 claim because the complaint contained nothing more than "the naked conclusion

51

that the . . . Defendants have 'agreed with each other' not to deal with Plaintiff." 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009), *aff'd*, 391 Fed. App'x 59 (2d Cir. 2010). The court observed that the complaint offered no facts that would indicate the existence of an illegal agreement, such as "when the alleged conspiracy began, where it occurred, or what statements the . . . [d]efendants made to one another." *Id.* Similarly, in the instant case, plaintiffs have pleaded no more than a "[t]hreadbare recital[] of the elements" of a Section 1 claim. *Iqbal*, 129 S.Ct. at 1949-50 (citing *Twombly*, 550 U.S. at 555). Because "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality [under Section 1]," *Twombly,* 550 U.S. at 557, defendants' motion to dismiss the Section 1 claim under Rule 12(b)(6) is granted.

### b. Section 2 Claim

"Monopoly power, or 'the power to control prices or exclude competition,'" is a "central element" of a Section 2 claim. *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 398 (E.D.N.Y. 2008) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). Plaintiffs allege that a wide swath of CPAs must be peer-reviewed because they conduct certain types of

audits, and only one other entity (PCAOB) conducts peer reviews. (Am. Compl. ¶¶ 52.A–G., 114–18.)  Apart from those assertions, however, plaintiffs provide no further allegations to support their conclusion that AICPA and NYSSCPA have "monopolized the market for Peer Review of Certified Public Accountants" in the United States and in New York State.  (Am. Compl. ¶ 234.) Hence, plaintiffs' allegations fall far short of the required showings, either directly through "evidence of the control of prices or exclusion of competition" or indirectly, through evidence that "the defendant has a large percentage share of the relevant market." *In re Payment Card*, 562 F. Supp. 2d at 399 (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)).  Furthermore, plaintiffs leave utterly unaddressed the second required showing for a Section 2 claim-- that defendants willfully acquired or maintained their monopoly power, versus growing or developing it due to a superior product, business acumen, or historic accident. *See PepsiCo*, 315 F.3d at 105.  Therefore, defendants' motion to dismiss the Section 2 claim under Rule 12(b)(6) is granted.

### 4. Pleading Standard for Robinson-Patman Claim

Plaintiffs bring a claim under Section 2 of the Clayton Act, 15 U.S.C. § 13 (as amended by the Robinson-Patman Act of 1936 and hereafter referred to as the "Robinson-Patman

Act"), and its enforcement provision, 15 U.S.C. § 15, which provides for treble damages.  The Robinson-Patman Act proscribes price discrimination "between different purchasers of commodities of like grade and quality" where, as a consequence of such discrimination, competition is substantially lessened, injured, destroyed, or prevented; or a monopoly is created.  15 U.S.C. § 13(a).  It is well-settled that the Robinson-Patman Act applies only to transactions involving "commodities," a term that courts have "strictly construed" to denote only "tangible products of trade."  *Innomed Labs. v. ALZA Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (citing *May Dep't Store v. Graphic Process Co.,* 637 F.2d 1211, 1214 (9th Cir. 1980) (internal quotation marks omitted)).  Unlike commodities, "intangible goods and services" are not subject to the Robinson-Patman Act.  *Nat'l Comm'ns Ass'n v. Am. Tel. & Tel. Co.*, 808 F. Supp. 1131, 1136 (S.D.N.Y. 1992), *rev'd on other grounds,* 46 F.3d 220 (2d Cir. 1995); *see also Innomed Labs.*, 368 F.3d at 156 ("The Robinson-Patman Act's prohibition on price discrimination extends only to transactions involving 'commodities,'" and not "intangible rights or services"); *Gordon v. New York Stock Exch., Inc.*  366 F. Supp. 1261, 1263 (S.D.N.Y. 1973) ("The authorities are clear that services and intangibles . . . are not 'commodities' within the meaning of the [Robinson-Patman] Act.") (citing *Columbia*

54

*Broad. Sys. v. Amana Refrigeration*, 295 F.2d 375 (7th Cir. 1961)).

### 5. Application

Plaintiffs concede, and the court agrees, that the peer review of accounting practices constitutes a service and not a commodity. (Pls.' Opp'n at 22.)  Therefore, peer review of accounting practices is not subject to the price discrimination provisions of the Robinson-Patman Act. Plaintiffs nevertheless attempt to analogize their peer-review engagements to the process of newspaper production, which the Eighth Circuit held was a "commodity" within the meaning of the Act in *Morning Pioneer v. Bismarck Tribune Co.* because, notwithstanding the extensive services involved in producing the paper, it is "predominantly a tangible good" that "takes on a tangible form and [] is bought and sold in the market place." (Pls.' Opp'n at 22 (citing *Morning Pioneer*, 493 F.2d 383, 389 n.11 (8th Cir. 1974)).  Plaintiffs claim that the peer-review reports that they draft as a result of their peer-review engagements are, like the newspapers described in *Morning Pioneer*, bought and sold in the market for peer review, and therefore "commodities" governed by the Robinson-Patman Act. (Pls.' Opp'n at 22.)

The Second Circuit recognizes the "dominant nature" or "dominant purpose" test employed in *Morning Pioneer* as a means to determine whether subjects that combine both tangible goods and intangible services are "commodities" for purposes of the Robinson-Patman Act. *See Innomed Labs*., 368 F.3d at 156 (citing *Tri-State Broad. Co., Inc. v. United Press Int'l, Inc.,* 369 F.2d 268, 270 (5th Cir. 1966)). Employing that test here, however, the court finds that the dominant purpose of peer review among CPAs is not the procurement of a report containing the peer review results; rather, the primary purpose is to be evaluated by others in the same field to maintain and enhance the quality of work performed in the field. (*See* Am. Compl. ¶ 48.) Although peer-reviews do result in a tangible report, they are not "bought and sold in the market place," *Morning Pioneer*, 493 F.2d at 389 n.11. Therefore, the facts as alleged in the Amended Complaint do not state a claim under the Robinson-Patman Act, and defendants' motion to dismiss plaintiffs' price-discrimination claim for failure to state a claim is granted.

## IV.  Remaining Claims:  Declaratory Judgment and State Law Claims

### A. Declaratory Judgment Claim

Plaintiffs request declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The Declaratory Judgment Act, however, provides only a federal

remedy, not a federal claim, so it can only be applied in cases in which there is an independent basis for the exercise of federal subject matter jurisdiction.  *See Goldberg v. Cablevision Sys. Corp.*, 281 F. Supp. 2d 595, 604 (E.D.N.Y. 2003) ("As all the federal claims must be dismissed, the Court lacks jurisdiction to grant relief pursuant to the Declaratory Judgment Act.")  Here, all of Plaintiff's federal claims are dismissed for failure to state a claim, and no substantive federal claim remains upon which plaintiffs can base their request for declaratory relief.

In addition, the purpose of declaratory relief is "to . . . settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships."  *Beacon Const. Co., Inc. v. Matco Elec. Co., Inc.*, 521 F.2d 392, 397 (2d Cir. 1975) (quoting *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)); *see also* 28 U.S.C. § 2201(a) (Declaratory Judgment Act provides that a federal court "may declare the *rights and other legal relations* of any interested party seeking such declaration . . . .") (emphasis added). Plaintiffs' request that this court declare, *inter alia*, that "[Colabella] is fit to be engaged to perform peer reviews in the State of New York and elsewhere," is not within the purview of

57

the Declaratory Judgment Act, as an evaluation of Colabella's fitness to perform peer review for fellow CPAs does not involve an adjudication of legal rights or relations.  Therefore, the declaratory judgment claim is dismissed.

**B. State Law Claims**

Finally, the court respectfully declines to exercise jurisdiction over plaintiffs' state law claims.  Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction."  Because the court has dismissed plaintiff's federal claims, the court will decline to exercise jurisdiction over plaintiff's state law claims.

/

/

/

/

/

/

/

/

/

58

## CONCLUSION

For the reasons explained above, the plaintiffs' claims are dismissed in their entirety with prejudice. Plaintiff has had two opportunities to assert sufficient allegations, most recently in the Amended Complaint with 281 paragraphs, some of which contain subparagraphs. Accordingly, the Clerk is respectfully requested to enter judgment in favor of defendants and close the case.

**SO ORDERED.**

Dated: September 28, 2011
Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge

59